**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Deborah Baker

    v.                                              Civil No. 10-cv-454-SM

Michael J. Astrue, Commissioner,
Social Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Deborah Baker moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423. The Commissioner, in turn, moves for an order affirming his decision. For the reasons that follow, I recommend that the decision of the Administrative Law Judge ("ALJ") be affirmed.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could

2

justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988). Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[ ] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 11. That statement is part of the court's record and will be summarized here, rather than repeated in full.

According to the Joint Statement, Baker has undergone a considerable amount of imaging and other diagnostic testing since 2002. That testing has yielded results pertaining to her back and her shoulder[1]. In addition, the Joint Statement notes a

---

[1] Diagnostic testing of Baker's back has revealed: (1) degenerative changes at C5-6; (2) no electrophysiologic evidence for a right cervical or left lumber radiculopathy; (3) posterior disc herniation at C5-6 with moderate central canal stenosis, moderate left neural foraminal stenosis, and moderate to severe right neural foraminal stenosis; (4) a right paracentral/right foraminal herniation at C6-7 with moderate central canal stenosis and moderate right neural foraminal stenosis; (5) degenerative changes T10-11 and T11-12 with milder degenerative change at the lower lumbar spine; (6) disc protrusions at T10-11 and T11-12; (7) extensive facet arthropathy L4-5 with a projecting synovial cyst projecting posteriorly; (8) L5-S1 disc protrusion; (9) fairly badly spondylitic disc at the T11-12

large number of impressions, assessments, and diagnoses of

conditions involving Baker's neck, back, shoulder, and lower

extremities,[2] along with diagnoses related to pain, various

mental conditions, and other physical conditions[3].

---

level; (10) widened left L4-5 facet joint; (11) degenerative
disc disease at C4-5; and (12) narrowing of exit foramina
bilaterally at C5-6.
    Diagnostic testing of Baker's shoulder has revealed: (1)
acromial clavicular joint arthropathy; (2) some osteoarthritic
changes at the acromioclavicular joint; (3) hypertrophic changes
in both AC joints and further narrowing in the right compared to
a 2002 exam; and (4) moderate to severe acromioclavicular
arthropathy and tendinopathy of supraspinatus, infraspinatus,
and subscapula tendon.

    [2] Diagnoses related to Baker's neck include: (1) cervical
strain; (2) whiplash (following a 2009 automobile accident); and
(3) cervicothoracic strain from a car accident.
    Diagnoses related to her back include: (1) osteoarthritis
cervical spine; (2) herniated disc, C5-6, C6-7; (3) L5/S1 left
paracentral disc herniation and left leg pain; and (4) right
lumbar radiculitis.
    Diagnoses related to her shoulder include: (1) myofascial
pain right trapezium; and (2) primary localized osteoarthritis,
shoulder region.
    And, diagnoses related to her lower extremities include:
(1) bilateral patellofemoral arthritis; and (2) sciatica.

    [3] Diagnoses related to Baker's pain include: (1) hip pain;
(2) chronic back pain; (13) myofascial low back pain; (4)
chronic neck and bilateral upper extremity pain; (5) chronic
pain, status post functional restoration program; (6) myofascial
hip pain; (7) knee pain and minor degenerative joint disease;
(8) neck pain and probable degenerative joint disease; (9)
chronic low back and neck pain; (10) right sacroiliac pain; and
(11) right more than left hip pain.
    Diagnoses related to mental conditions include: (1)
depression; (2) major depressive disorder; (3) anxiety; (4)
sleep issues; (5) escalating depression and anxiety severe
enough to warrant a crisis intervention; (6) major depressive
disorder recurrent, presently mild/moderate; (7) history of
amphetamine abuse in long remission; (8) premenstrual dysphoric

Baker's medical treatment has included: (1) bilateral sacroiliac joint injections; (2) cervical epidural steroid injections; (3) epidural steroid injections; (4) a C5-6, C6-7 anterior cervical discectomy with patella allograft fusion and anterior cervical plating with Stryker plate C5-7, C6-7; (5) a number of different pain medications; (6) six months of rehabilitation; (7) mental-health therapy; (8) a fourteen-day functional restoration program ("FRP") at the Dartmouth-Hitchcock Medical Center's Spine Center ("Spine Center"); and (9) four months of counseling and pharmacological management for mental-health conditions.

When Baker began her FRP, she was given a physical capacity test that showed she was able to lift ten pounds frequently and fifteen pounds occasionally. Accordingly, she was assessed as having the capacity for sedentary work, as that term is used in the Dictionary of Occupational Titles ("DOT"). Her discharge summary from the FRP indicates that her capacity for frequent lifting had increased from ten to twenty-five pounds for waist-to-shoulder lifting, and from ten to thirty pounds for floor-to-waist lifting. It also indicates that her capacity for

disorder; and (9) history of personality disorder NOS with mixed traits.

And diagnoses related to other physical conditions include: (1) hypertension; (2) wrist tendonitis; (3) medial epicondylitis; (4) muscle imbalances with biomechanical deficits; and (5) gait abnormality.

occasional lifting and two-handed carrying had increased from
fifteen to thirty-five pounds.  Thus, she was assessed as having
a capacity for light work.  Finally, the discharge summary
describes Baker's vocational goals upon entering the FRP: "None,
applied for SSD."  Tr. 607.  At the end of the FRP, her
vocational goals were described this way: "None, Ms. Baker does
not feel she is psychologically stable enough to work at this
time."  Id.

        The record includes no treating-source or examining-source
opinions on Baker's physical ability to perform work-related
activities.  The record does, however, include a Physical
Residual Functional Capacity ("RFC") Assessment completed by Dr.
Joseph Cataldo, an agency consultant.  Dr. Cataldo assessed
Baker as having the ability to: (1) lift and/or carry twenty
pounds occasionally and ten pounds frequently; (2) stand and/or
walk (with normal breaks) for about six hours in an eight-hour
workday; (3) sit (with normal breaks) for about six hours in an
eight-hour workday; (4) push and/or pull without any limitation
other than those for lifting and/or carrying.  Dr. Cataldo
further assessed Baker as having the ability to occasionally
climb ramps/stairs and ladders/ropes/scaffolds, balance, stoop,
kneel, crouch, and crawl.  He found no manipulative, visual, or
communicative limitations and one environmental limitation,
i.e., that Baker should avoid even moderate exposure to hazards.

With respect to manipulative limitations, Dr. Cataldo found that there were no limitations on Baker's capacity for reaching, handling, fingering, and feeling.

At the request of the Social Security Administration ("SSA"), Dr. Rexford Burnette performed a psychological evaluation of Baker and completed a Comprehensive Psychological Profile on her.  Baker was referred to Dr. Burnette because of her claim of disabling depression.  Dr. Burnette offered two diagnostic impressions: (1) pain disorder associated with both psychological factors and a general medical condition, chronic; and (2) anxiety disorder not otherwise specified.  In addition, Dr. Burnette ruled out depressive disorder not otherwise specified, noting that "depression did <u>not</u> appear to be a significant factor in the present evaluation despite Dr. Ramirez's diagnosis of a Major Depressive Disorder in 03/2007." Administrative Transcript (hereinafter "Tr.") 440 (emphasis in the original).  With regard to Baker's then-current level of functioning, Dr. Burnette made the following relevant findings:

> <u>Understanding and Memory</u> (ability to understand and remember instructions) – Based on this limited evaluation, Ms. Baker appears to have an intact ability to understand both verbal and written instructions, and to remember these.
>
> . . . .
>
> <u>Concentration and Task Completion</u> (ability to sustain attention and complete tasks) – Ms. Baker's ability to sustain concentration appears to be

> moderately impacted by her experience of pain.
> Nevertheless, she likes to keep busy and still
> accomplishes many tasks within the home setting in
> spite of the pain.  In her last job, she felt that her
> pain was interfering so much with her ability to
> concentrate and accomplish work-related tasks that she
> "went on short-term disability".

Tr. 439-40.

Shortly after Dr. Burdette completed his psychological profile, Dr. Nicholas Kalfas, an agency consultant, completed a Mental Residual Functional Capacity Assessment on Baker.  Under the heading "Understanding and Memory," Dr. Kalfas found no significant limitation on Baker's ability to remember locations and work-like procedures or her ability to understand and remember both simple and detailed instructions.  Under the heading "Sustained Concentration and Persistence," Dr. Kalfas found that Baker was moderately limited in her ability to: (1) carry out detailed instructions; and (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Under that same heading, Dr. Kalfas found that Baker had no significant limitations in six other areas, including: (1) the ability to maintain attention and concentration for extended periods; and (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within normal tolerances.

Dr. Kalfas's narrative functional capacity assessment provides as follows:

> This is a 47 y o female with an AOD of 8/19/06 [who] alleges fibromyalgia with difficulty concentrating. Claimant notes limitations with memory, completing tasks, concentration and getting along with others at times (SSA 3373 Function Report).  Medical evidence supports the allegations and the credibility of the claimant's statements.
>
> Medical evidence includes the function report – adult completed on 5/14/07 by the claimant.  Genesis Behavioral Health dos 11/28/06 – 3/14/07.  Rexford F. Burnette, Ph.D. (Consultative Examiner) dated 8/6/07 whose opinion is given most weight.
>
> Despite impairments, the claimant is able [to] understand, remember and carry out short and simple instructions.  She is able to maintain attention for same for short periods of time with attention interrupted by pain.  She is able to maintain a schedule and is able to persist to task with frequent interruptions due to pain.

Tr. 458.

During the course of the SSA's review of Baker's claim, she received a hearing before an ALJ.  At Baker's hearing, the ALJ asked a vocational expert ("VE") a hypothetical question, referred to below as hypothetical number one, which was based on the following RFC:

> [T]he first hypothetical is to assume that [Baker] can work at the light level, 20 pounds occasionally, 10 pounds frequently.  She's able to stand and/or walk six hours in an eight hour workday.  She can sit with normal breaks for a total of six hours in an eight hour workday.  Has unlimited use of her hands and her feet to operate controls.  Should only occasionally bend, stoop, crouch, crawl and should avoid moderate exposure to hazards.  She should also be in unskilled

positions, that have simple instructions because she
would be able to maintain attention for short periods
of time that would be interrupted with pain.  But she
would be able to maintain a schedule and persist at
the tasks, again with interruptions due to pain.  Able
to interact appropriately with coworkers and
supervisors.  And can accommodate routine changes in
the work setting.  And set realistic workplace goals.

Tr. 37.  Based upon that hypothetical, the VE determined that

Baker was capable of light factory work.  Baker's attorney then

engaged the ALJ on the issue of Baker's ability to maintain

attention with interruptions due to pain:

> ALJ:   That's all the questions that I have.  Do
> you have any questions of Mr. Hall?
>
> ATTY:  Yes, I do, Your Honor.  Actually, Your
> Honor, just for clarification for hypothetical number
> one.  You said maintaining attention for short periods
> of time.  Can you further clarify that?  You said
> interruptions due to pain.
>
> ALJ:   I don't think so, I think, I'm just going
> by what the record reflects and so I'm trying to
> pretty much stay to what the, the testimony, the
> evidence in the record is.  And that's not defined.  I
> guess that's pretty much the broadest statement that I
> can find.
>
> . . .
>
> VE:   Sir, I did have that in my notes if you
> want me to, I don't want to –
>
> ALJ:   All right.
>
> VE:   – speak inappropriately.  But I believe
> what you're referencing about the pain was in the
> context of still able to maintain a schedule.
>
> ATTY:  Right.  But frequent interruptions due to
> pain.

VE:    That's what I have, but it was prefaced by, even though that factor is present, still able to maintain a schedule.  If that helps.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q    Okay.  Well, if, if we were to have a hypothetical with frequent interruptions due to pain, does that change your testimony?

A    Ma'am, I would need clarification.  I'm sure frequent to you is different from, to me or the court, so.

Q    Well, frequent to Social Security is up to two-thirds of the time.

A    Okay.  So what I'm hearing from you is that two-thirds of the day, she would be off-task due to pain?

Q    That's at Exhibit 12F, which says frequent interruptions due to pain.

A    Okay.  If that, if I'm interpreting that right, that would have a negative impact and preclude.

Tr. 38-40.  While the foregoing exchange began as a discussion of the impact of pain on Baker's ability to maintain attention, it subtly morphed into a discussion of the impact of pain on her ability to maintain a schedule, two abilities that were addressed separately in Dr. Kalfas's assessment.  Later in the hearing, the ALJ followed up:

Q    So let me clarify then, if we assume hypothetical number one, and since I don't have any clarification of what anyone meant by frequent interruptions due to pain, and based upon the testimony this morning, it seems to indicate that there are days where she's just fine.  Let's take that out and just say that she has the ability to maintain a schedule, but again, I, I'm presuming simple

instructions, unskilled.  Does that change your
opinion?

A     No, sir.  It would remain as stated.

Tr. 41.

For her part, Baker's counsel did not challenge the ALJ's
determination that Baker was capable of light work or the ALJ's
implicit determination that Baker had an unlimited capacity for
reaching, pushing, and pulling.  Nor did Baker's counsel pose a
hypothetical question to the ALJ that incorporated either a
limitation to sedentary work, or a limitation on reaching,
pushing, or pulling.  Baker's counsel did, however, ask one
hypothetical question, which concerned the jobs available to a
person who would be off task for two thirds of the workday due
to pain.  The VE testified that such a limitation would preclude
any work.

While it is far from clear, it appears from the hearing
transcript that the ALJ may have asked a final hypothetical
question, based on the RFC in the first hypothetical, plus an
additional limitation: the ability to apply common sense and
understanding to carry out detailed but uninvolved written or
oral instructions.[4]  In response, the VE testified that even if a

---

[4] That limitation is based on a concept known as general
educational development ("GED"), which is a part of the
description of every job listed in the DOT.  GED "embraces those
aspects of education (formal and informal) which are required of
the worker for satisfactory job performance."  U.S. Dep't of

person with that RFC could not do light-duty factory work, that

person could work as a bill clerk (classified as light, with an

SVP[5] of 2), as a marker (classified as light, with an SVP of 2),

and as a cleaner (classified as light, with an SVP of 2).

After the hearing, the ALJ issued a decision that includes

the following findings of fact and conclusions of law:

> 3.  The claimant has the following severe impairments:
> status post-fusion operation at C5-7, degenerative
> disc disease at C4-5 and depression (20 CFR
> 404.1520(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals one of the listed impairments in 20 CFR Part
> 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
> 404.1525 and 404.1526).
>
> . . . .

---

Labor, Emp. & Training Admin., Dictionary of Occupational
Titles, Vol. II, App. C, at 1009 (4th ed., rev. 1991).  A
particular job's GED, in turn, is described in terms of levels
of reasoning development, mathematical development, and language
development.  In the area of reasoning development, level one
requires a person to, among other things, "[a]pply commonsense
understanding to carry out simple one- or two-step
instructions."  Id. at 1011.  Level two requires a person to
"[a]pply commonsense understanding to carry out detailed but
uninvolved written or oral instructions."  Id.

[5] "SVP" stands for "specific vocational preparation" which
"is defined as the amount of lapsed time required by a typical
worker to learn the techniques, acquire the information, and
develop the facility needed for average performance in a
specific job-worker situation."  DOT, Vol. II, App. C, at 1009.
A job with an SVP of two is one that can be learned in
"[a]nything beyond short demonstration up to and including 1
month."  Id.

5.  After careful consideration of the entire record,
the undersigned finds that the claimant has the
residual functional capacity to perform light work as
defined in 20 CFR 404.1567(b); she can lift ten
pounds, can stand and/or walk 6 of 8 hours, can sit
with normal breaks for 6 of 8 hours, has unlimited use
of the hands and feet, can occasionally bend, stoop,
crouch and crawl and needs to avoid moderate exposure
to hazards.  She requires simple instructions; she can
pay attention for short periods of time with
interruptions due to pain; she can interact with co-
workers and supervisors and she can set goals.

. . . .

6.  The claimant is unable to perform any past
relevant work (20 CFR 404.1565).

. . . .

10.  Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
404.1569 and 404.1569(a)).

Tr. 9, 10, 11, 14, 15.  The ALJ further stated that "the

vocational expert's testimony [was] consistent with the

information contained in the Dictionary of Occupational Titles."

Tr. 15.  In his decision, the ALJ said that the VE testified

that Baker could "perform factory jobs and jobs as a mail clerk,

a marker, and a cleaner."[6]  Tr. 15.

Finally, at the end of the hearing, the ALJ granted Baker's

request to submit a post-hearing memorandum of law on various

aspect of the VE's testimony.  Baker did not, however, seek to

---

[6] The court notes that the VE actually testified that a
person with the RFC the ALJ described could work as a bill clerk
rather than a mail clerk, but that discrepancy is of no moment.

address: (1) the evidentiary support for Dr. Cataldo's opinion; or (2) her exertional limitations and the ALJ's clear foreshadowing of his determination that she was capable of light work.

## Discussion

According to Baker, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) erroneously determined that her shoulder impairment was not severe; (2) based his RFC determination largely on an opinion from a state-agency physician that was itself based on an incomplete record; (3) made an RFC determination that did not adequately account for the severity of her mental impairment; and (4) erroneously determined that there were jobs available in the national economy that she could perform. Baker's last argument is based on four sub-arguments: (a) the testimony of the vocational expert was unreliable due to the ALJ's use of a flawed RFC and a flawed hypothetical question; (b) the ALJ inconsistently determined that Baker was only able to lift ten pounds, but had the RFC for light work, which requires the ability to lift twenty pounds; (c) the VE's testimony about other jobs Baker could perform was based on a hypothetical that the ALJ did not actually adopt in his decision; and (d) the ALJ failed to resolve a discrepancy between the DOT and the VE's testimony.

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question in this case is whether Baker was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

When determining whether a claimant is disabled for the purpose of determining eligibility for disability insurance

benefits, an ALJ is required to employ a five-step process.  <u>See</u>

20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

<u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is

disabled.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  <u>See</u> <u>Mandziej v.</u>

<u>Chater</u>, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing <u>Paone v.</u>

<u>Schweiker</u>, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  However,

> [o]nce the [claimant] has met his or her burden at
> Step 4 to show that he or she is unable to do past
> work due to the significant limitation, the
> Commissioner then has the burden at Step 5 of coming
> forward with evidence of specific jobs in the national
> economy that the [claimant] can still perform.  <u>Arocho</u>
> <u>v. Sec'y of Health & Human Servs.</u>, 670 F.2d 374, 375
> (1st Cir. 1982).  If the [claimant's] limitations are
> exclusively exertional, then the Commissioner can meet
> her burden through the use of a chart contained in the
> Social Security regulations.  20 C.F.R. § 416.969;

17

Medical-Vocational Guidelines, 20 C.F.R. pt. 404,
subpt. P, App. 2, tables 1-3 (2001), cited in 20
C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458
(1983). "The Grid," as it is known, consists of a
matrix of the [claimant's] exertional capacity, age,
education, and work experience.  If the facts of the
[claimant's] situation fit within the Grid's
categories, the Grid "directs a conclusion as to
whether the individual is or is not disabled."  20
C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited
in 20 C.F.R. § 416.969.  However, if the claimant has
nonexertional limitations (such as mental, sensory, or
skin impairments, or environmental restrictions such
as an inability to tolerate dust, id. § 200(e)) that
restrict his [or her] ability to perform jobs he [or
she] would otherwise be capable of performing, then
the Grid is only a "framework to guide [the]
decision," 20 C.F.R. § 416.969a(d) (2001).  See also
Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)
(discussing use of Grid when applicant has
nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

[i]n assessing a disability claim, the [Commissioner]
considers objective and subjective factors, including:
(1) objective medical facts; (2) plaintiff's
subjective claims of pain and disability as supported
by the testimony of the plaintiff or other witness;
and (3) the plaintiff's educational background, age,
and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

## B. Baker's Shoulder Impairment

Baker first argues that the ALJ erroneously determined that

her shoulder impairment was not severe, as that term is used at

step two of the sequential analysis.  That argument is a non-starter.

It is well established in this circuit "that the Step 2 severity requirement is . . . to be a de minimis policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  Under Social Security Ruling ("SSR") 85-28, "a finding of 'non-severe' is only to be made where 'medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'"  McDonald, 795 F.2d at 1124.  In other words, proper application of step two should "do no 'more than allow the [Commissioner] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'"  Id. at 1125 (quoting Baeder v. Heckler, 768 F.2d 547, 553 (3d Cir. 1985)) (emphasis added).

If Baker's claim for benefits rested solely on her shoulder condition, then, arguably, the ALJ should have deemed that impairment severe, given the standard established in McDonald, 795 F.2d at 1124.  But where, as here, the ALJ found other severe impairments, and his analysis proceeded to the determination of an RFC, his decision not to deem Baker's

shoulder condition a severe impairment was, at worst, a harmless error.

That is because "[i]n assessing RFC, the adjudicator must consider limitations imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 86-8p, 1996 WL 374184, at *5 (S.S.A. 1996); see also Hickman v. Comm'r of Soc. Sec. Admin., 399 F. App'x 300, 302 (9th Cir. 2010) ("Any error in the ALJ's failure to include a reading disorder as one of Hickman's severe impairments at step two of the analysis is harmless.  The ALJ found Hickman suffered from other severe impairments and, thus, step two was already resolved in Hickman's favor.") (citing Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005).  As the Court of Appeals for the Eleventh Circuit has explained:

> Even if the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that Heatly had a severe impairment: and that finding is all that step two requires.  See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. [1983]) (applying the harmless error doctrine to social security cases); Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987) ("the finding of any severe impairment . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" is enough to satisfy step two) (emphasis added).
>
> Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe.  Instead, at step three, the ALJ is required to demonstrate that it has considered all of the claimant's impairments, whether severe or not, in

>       combination.  See id.; Bowen v. Heckler, 748 F.2d 629,
>       635 (11th Cir. 1984) (explaining that the ALJ must
>       make "specific and well-articulated findings as to the
>       effect of the combination of impairments").

Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824-25 (11th

Cir. 2010) (footnote omitted).

Here, the ALJ noted the medical evidence of Baker's

shoulder condition in his decision, see Tr. 10, and also

acknowledged her complaints of shoulder pain, see Tr. 12.  Thus,

there is ample evidence in the record to suggest that the ALJ

did consider Baker's shoulder condition when he determined her

RFC, and nothing to suggest that he did not.  If the ALJ erred

by failing to deem Baker's shoulder condition a severe

impairment, a question the court need not decide, that error was

harmless.  The ALJ did not deny Baker's claim due to the lack of

a severe impairment, and there is no support in the record for a

determination that the ALJ did not comply with SSR 86-8p.

## C. The ALJ's Reliance on Dr. Cataldo's Opinion

Baker next argues that the ALJ's RFC finding was not

supported by substantial evidence because the ALJ gave great

weight to Dr. Cataldo's assessment of her physical RFC, and that

assessment was based on an incomplete record.  Specifically,

Baker argues that Dr. Cataldo did not consider her severe

shoulder impairment, and identifies certain evidence concerning

that impairment that was not added to the record until after Dr.

Cataldo completed his assessment.  In Baker's view, Dr.
Cataldo's purported failure to consider her shoulder condition
is significant because all the jobs the VE said she could do
require frequent reaching and may require significant pushing
and pulling, all three being activities in which she says she is
limited due to her shoulder condition.

Baker asserts that Dr. Cataldo "did not consider [her]
severe shoulder impairment," but the RFC assessment form Dr.
Cataldo filled out expressly directed him to "[b]ase [his]
conclusions on **all evidence** in the file," Tr. 460, and Dr.
Cataldo specifically referred to treatments records from Baker's
primary care physician, <u>see</u> Tr. 467.  Those records, in turn,
mention Baker's shoulder condition.  Thus, the court cannot
conclude that Dr. Cataldo failed to consider Baker's shoulder
condition.

Turning to the question of the medical records on which Dr.
Cataldo based his opinion, the court notes that Baker did not
challenge the sufficiency of those records at her hearing before
the ALJ, nor did Baker ask to provide post-hearing briefing on
the reliability of Dr. Cataldo's opinion.  Had that really been
a significant issue, Baker could have raised it during or
immediately after her hearing, when it could have been addressed
and remedied.  Instead, after remaining silent until now, Baker
is trying to play her failure to provide medical records to Dr.

Cataldo in a timely fashion as a trump card that entitles her to a remand.  The court is not sympathetic to such a strategy.

Regarding the weight he gave Dr. Cataldo's opinion, the ALJ explained that Dr. Cataldo's "assessment [was] consistent with the substantial weight of the objective medical evidence of record," Tr. 13, and he pointed, in particular, to the findings that resulted from Baker's participation in the Spine Center's FRP.  The court further notes that the ALJ's decision to give great weight to Dr. Cataldo's opinion is supported, at least indirectly, by the lack of any treating-source or examining-source opinion that contradicts Dr. Cataldo's opinion.

Beyond that, the records Baker identifies as documenting her "severe shoulder impairment" cannot bear nearly as much weight as Baker places on them.  Those records include: (1) office notes from the Spine Center, to which Baker was referred "for consultation relative to her cervical spine related complaints," Tr. 771; (2) the results of a functional assessment performed by the Spine Center, see Tr. 779-81; (3) the report of a physical-therapy examination conducted at the Spine Center on the first day of Baker's FRP,[7] see Tr. 789-91; (4) a report on a meeting of the Spine Center's FRP admissions staff regarding Baker, see Tr. 800-09; (5) a contact note from Genesis

---

[7] Under the heading "Vocational Goal," the examination form notes: "Deborah M. Baker does not intend to return to work." Tr. 789.

Behavioral Health in which Baker mentioned shoulder pain to her mental-health therapist; (6) an initial outpatient evaluation from Granite Physiatry, Tr. 1025; and (7) a daily note from the Pemi-Baker Aquatic & Wellness Center, Tr. 1039.  Those records are remarkably thin with respect to Baker's shoulder condition. At most, they document Baker's subjective complaints about shoulder pain, largely to medical personnel from whom she was not seeking treatment for her shoulder.  Thus, those records contain little if any actual medical information, and no diagnoses of or treatment plans for a shoulder impairment.  On that basis, Baker substantially overstates the case when she refers to the medical record presented to Dr. Cataldo as "materially incomplete."

Finally, Baker's reliance on Alcantara v. Astrue, 257 F. App'x 333 (1st Cir. 2007), and Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995), is misplaced.  In both cases, the ALJ relied on medical records that were generated before the claimants in those cases suffered substantial, well-documented deteriorations in their conditions.  See Alcantara, 257 F. App'x at 334; Frankl, 47 F.3d at 937-38.  Here, by contrast, Baker does not fault Dr. Cataldo's opinion for relying on medical records that predate some substantial change in her condition; she only faults it for failing to consider various stray medical records, many of which she could have provided him in the first instance,

24

but did not.  In addition, both Alcantara and Frankl had
something this case lacks: treating-source opinions favorable to
the claimants that the ALJs declined to credit based on the
unfavorable opinions from agency consultants.  See Alcantara,
257 F. App'x at 334; Frankl, 47 F.3d at 938.  As noted above,
Baker, who has the burden of proving that she is disabled, see
Bowen, 482 U.S. at 146, has submitted no treating-source
opinions on her ability to perform work-related activities, much
less one that is favorable to her claim.

        In sum, Baker is not entitled to a remand based on the
ALJ's reliance on Dr. Cataldo's opinion.

        D. Baker's Mental Impairment

        Baker also argues that the ALJ's RFC finding does not
adequately account for the severity of her mental impairment.
More specifically, Baker accuses the ALJ of ignoring limitations
on her RFC, resulting from pain, that were found by Dr. Kalfas.
Her argument is unavailing.

        Dr. Kalfas found that Baker had a moderate limitation in
her ability to carry out detailed instructions.  The ALJ
accounted for that limitation by finding that Baker was
restricted to jobs involving only simple instructions.

        Dr. Kalfas also found that Baker was moderately limited in
her ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform
at a consistent pace without an unreasonable number and length
of rest periods.  He clarified that finding in his narrative
functional capacity assessment: "She is able to maintain a
schedule and is able to persist to task with frequent
interruptions due to pain."  Tr. 458.  In Baker's view, the ALJ
erred by "ignor[ing] Dr. Kalfas' task-persistence limitation of
frequent interruptions due to pain," and then compounded his
error by failing to explain why he ignored that limitation.

In her reply memorandum, Baker resurrects an argument she
first raised at her hearing and then, wisely, declined to pursue
in her initial brief.  Specifically, she argues that by using
the SSA term of art "frequent" to describe Baker's interruptions
due to pain, Dr. Kalfas was opining that Baker would be off task
for up to two thirds of each workday.  That argument is
inventive but not persuasive, and Dr. Kalfas's report cannot
reasonably be read as saying any such thing.

In the context of defining "light work" to require
"frequent lifting or carrying of objects weighing up to ten
pounds," SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983), SSR 83-
10 explains that "[f]requent means occurring from one-third to
two-thirds of the time," id. at *6.  In SSR 83-10, the term
"frequent" is used to describe duration, i.e., the amount of
time a person performing a particular job will be engaged in a

particular activity.  Here, however, Dr. Kalfas was not using

the term "frequent" in a durational sense to indicate how much

time each day Baker would spend being interrupted; he was using

the term to indicate the number of interruptions Baker would

have during the day.  Thus, while Dr. Kalfas did offer an

opinion about how many interruptions Baker would have, he said

nothing about the duration of those interruptions either

individually or collectively.

Moreover, construing Dr. Kalfas's use of the term

"frequent" to indicate that Baker would spend between one third

and two thirds of her workday in a state of interruption renders

all but meaningless the part of the sentence that comes before

the reference to frequent interruptions, in which Dr. Kalfas

opined that Baker was able to maintain a schedule and was able

to persist to task.  If Dr. Kalfas really intended the term

"frequent" to have the durational meaning Baker ascribes to at,

he would have said something along these lines: "Baker cannot

maintain a schedule and cannot persist to task because she is

will be frequently interrupted from her work due to pain."  But

that is not what Dr. Kalfas said.

In addition to misappropriating the concept of "frequency,"

Baker also appears to misconstrue Dr. Kalfas's assessment.  In

the legal context of this case, it is important to bear in mind

that Dr. Kalfas's statements about interruptions due to pain, on

their own, are no more meaningful than a medical diagnosis.  The
dispositive issue is not what conditions a claimant has but,
rather, the effect those conditions have on a claimant's ability
to perform work-related activities.  Here, while Dr. Kalfas said
that Baker's attention was "interrupted by pain," he said that
while opining that she was "able to maintain attention . . . for
short periods of time."  Tr. 458.  And while he also noted
"frequent interruptions due to pain," he did so in the context
of opining that Baker was "able to maintain a schedule and [was]
able to persist to task," id.

Thus, the references to pain that Baker calls limitations
are better understood as observations made in the context of a
determination that Baker was able to maintain attention for
short periods of time, maintain a schedule, and persist to task.
Whatever effect they may have, the interruptions described by
Dr. Kalfas do not prevent Baker from maintaining attention for
short periods of time, maintaining a schedule, and persisting to
task.  Accordingly, Dr. Kalfas's comments about interruptions
are not limitations that the ALJ had to account for and have
little relevance to determining Baker's RFC.

E. Step Five

Baker argues that the ALJ committed four separate errors in
making his step-five determination that she is capable of

performing jobs that exist in the national economy.  The court considers each argument in turn.

### 1. The VE's Reliance on the ALJ's RFC

Baker argues that the testimony of the VE was unreliable due to the ALJ's use of a flawed RFC and a flawed hypothetical question.  Her argument rests entirely on the two arguments about the ALJ's RFC determination discussed in the previous section.  Because the court finds no fault with the ALJ's RFC determination, his use of that determination to craft hypothetical questions for the ALJ provides no basis for a remand.

### 2. Baker's Ability to Lift

Baker argues that the ALJ's REC for light work is invalidated by his specific finding that she is capable of lifting only ten pounds, because work at the light level requires the ability to lift twenty pounds.  The court is not persuaded.

In his decision, the ALJ did say that Baker "can lift ten pounds," Tr. 11, and that she "has the residual functional capacity to lift ten pounds," Tr. 14.  Notwithstanding the Commissioner's argument to the contrary, the plain meaning of those statements is that Baker can lift only ten pounds.  Moreover, Baker is correct in pointing out that light work

requires an ability to lift twenty pounds. See 20 C.F.R. §
404.1567(b).

If this were a case in which Baker had produced medical
opinion evidence, or any other evidence, that limited her to
lifting only ten pounds, the court would readily conclude that
the ALJ had committed a legal error by determining that a person
who could lift only ten pounds was capable of performing light
work. But this is not such a case. There no evidence that
Baker cannot lift twenty pounds, and substantial evidence that
she can. Dr. Cataldo opined that Baker could lift ten pounds
frequently and twenty pounds occasionally. See Tr. 461. At the
conclusion of Baker's FRP at the Spine Center, Dr. Rowland
Hazard reported that she had the capacity to lift thirty-five
pounds frequently and twenty-five pounds occasionally. See Tr.
607. And, at her hearing, Baker told the ALJ:

> Oh, wait a minute, I should say I pick up my grandson.
> My youngest grandson. That's, he's the lightest one
> out of all of them and I think he weighs, he may weigh
> 20 pounds. So, I, I should throw that in there. I
> would be, I wouldn't be very honest if I didn't.

Tr. 25-26. Perhaps in light of Baker's testimony, her counsel
did not challenge the ALJ's hypothetical to the VE, which
included the ability to lift ten pounds frequently and twenty
pounds occasionally, nor did she pose a hypothetical question of
her own to the VE that included an RFC for sedentary work.
Based on the foregoing, the court has no difficulty concluding

that the apparent mistake in the ALJ's determination that Baker
is capable of light work was the result of a clerical error,
i.e., a simple omission of a finding that Baker could lift
twenty pounds occasionally, rather than a legal error warranting
remand.  Baker asks the court for a remand, to allow the ALJ to
clarify what he meant to say about her capacity for lifting, but
given the record evidence, a remand to correct this particular
error would elevate form over substance and consume scarce
administrative resources for no good purpose.

### 3. The VE's Reliance on the ALJ's Hypothetical

Baker next argues that the VE's testimony about other jobs
she could perform cannot support the ALJ's step-five decision,
because that testimony was based on a hypothetical that
incorporated an RFC that the ALJ did not actually adopt in his
decision.  Baker's argument is based on the following
observations: (1) the RFC the ALJ adopted in his decision
specified that Baker "can pay attention for short periods of
time with interruptions due to pain," Tr. 11; (2) when the VE
testified that Baker was capable of performing the jobs of
factory worker, bill clerk, marker, and cleaner, he did so in
response to a hypothetical question that included the ability to
maintain a schedule but did not include the qualification "with
frequent interruptions due to pain."  In Baker's view, the VE's

testimony provides no basis for the ALJ's step-five determination because it was not based on the RFC the ALJ adopted in his decision.  The court does not agree.

As a preliminary matter, Baker's argument appears to perpetuate the conflation of Baker's ability to maintain attention and her ability to maintain a schedule that first cropped up at the hearing.  Moreover, Baker's argument rests on essentially the same faulty premise as her challenge to the ALJ's determination of her mental RFC.

In his first hypothetical question, the ALJ described the following limitations:

> She should also be in unskilled positions, that have simple instructions because she would be able to maintain attention for short periods of time that would be interrupted with pain.  But she would be able to maintain a schedule and persist at the tasks, again with interruptions due to pain.

Tr. 37.  Those limitations closely track the mental RFC assessment of Dr. Kalfas, who wrote:

> Despite impairments, the claimant is able to understand, remember and carry out short and simple instructions.  She is able to maintain attention for same for short periods of time with attention interrupted by pain.  She is able to maintain a schedule and is able to persist to task with frequent interruptions due to pain.

Tr. 458.  Later at the hearing, in the face of some confusion over what, exactly, Dr. Kalfas meant by "frequent interruptions," the ALJ posed a hypothetical question with the

following amendment: "Let's take that out and just say that she
has the ability to maintain a schedule, but again I, I'm
presuming simple instructions, unskilled."  Tr. 41.

Baker makes far too much of the way the ALJ handled Dr.
Kalfas's mention of "frequent interruptions due to pain."  Dr.
Kalfas did state that Baker would be subject to frequent
interruptions due to pain, but, as noted above, he did so in the
context of saying that she was able to perform two work-related
activities: maintaining a schedule and persisting to task.
Those assessments of Baker's ability to perform work-related
activities were incorporated into the hypothetical question that
Baker challenges.  Given Baker's ability to maintain a schedule
and persist to task, the ALJ's omission of Dr. Kalfas's
observation about frequent interruptions was not an omission of
any actual limitation on Baker's ability to perform work-related
activities.  And, because Dr. Kalfas's observation about
frequent pain-related interruptions was not a limitation, the
ALJ's hypothetical question excluding that observation did not
deviate in any material way from the RFC in his decision.
Because Dr. Kalfas expressly determined that Baker was able to
maintain a schedule and persist to task, despite frequent
interruptions due to pain, the ALJ's deletion of that
essentially irrelevant observation from his hypothetical
question does not undermine the VE's testimony.

<u>4. VE Testimony and the DOT</u>

Baker's final argument is that she is entitled to a remand because the vocational expert's testimony was inconsistent with the DOT and the ALJ failed resolve that inconsistency.  Baker is mistaken.

When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled."  SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. 2000).  Accordingly:

> When a VE . . . provides evidence about the
> requirements of a job or occupation, the adjudicator
> has an affirmative responsibility to ask about any
> possible conflict between that VE . . . evidence and
> information provided in the DOT.  In these situations,
> the adjudicator will:
>
>> Ask the VE . . . if the evidence he or she has
>> provided conflicts with information provided in
>> the DOT; and
>>
>> If the VE's . . . evidence appears to conflict
>> with the DOT, the adjudicator will obtain a
>> reasonable explanation for the apparent conflict.

<u>Id.</u> at *3.

Here, the ALJ did not expressly ask the VE whether the evidence he presented concerning the requirements of the jobs he said Baker could do were consistent with those stated in the

DOT.[8]  But, Baker does not identify any inconsistency between the VE's testimony and the information in the DOT.  "A direct and obvious conflict exists when the VE's characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill provided for that job in the DOT."  Szumylo v. Astrue, ___ F. Supp. 2d ___, ___, 2011 WL 4578369, at *5 (D. Mass. Sept. 30, 2011) (quoting Cooper v. Comm'r of Soc. Sec. Admin., Civ. No. 3:09-CV-1302-BF, 2011 WL 61613, at *7 (N.D. Tex., Jan. 6, 2011); citing Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000)) (internal quotation marks omitted).  Here, Baker does not identify anything the VE said about any of the jobs she could do that is facially different from anything the DOT says about those jobs.  The VE identified four jobs and indicated that they were all light-duty and had a SVP of 2.[9]  The DOT describes those four jobs in the very same way.  While the ALJ probably should have asked the VE,

---

[8] The ALJ did ask the VE whether he was familiar with the DOT, but the court tends to agree with Baker that the ALJ's general query was not enough to meet his responsibility to ask the VE whether his testimony was consistent with the DOT.  The ALJ also said that he thought Baker performed her past relevant factory work in a manner that comported with the DOT, but said nothing about whether his testimony about the bill clerk, marker, and cleaner jobs was consistent with the descriptions of those jobs in the DOT.

[9] While there may be merit to the argument that GED is a more relevant characteristic than SVP in light of Baker's need for simple instructions, the VE did not give the GEDs for any of the jobs she said Baker could do.

directly, whether his testimony was consistent with the DOT, his failure to do so was entirely harmless given that there is no inconsistency between the VE's testimony and the DOT. Without any inconsistency, there was nothing for the VE to explain.

In addition, as with many of the issues Baker has identified, she said nothing about any inconsistency between the VE's testimony and the DOT at her hearing. That is fatal to her argument. See Aho v. Comm'r of Soc. Sec. Admin., Civil No. 10-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) (citing Donahue v. Barnhart, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late."); Carey, 230 F.3d at 147 (accepting vocational expert's testimony, in part, because the testimony was unchallenged); Corcoran v. Astrue, Civ. No. 09-30230, 2011 WL 2023292, at *7 (D. Mass. Apr. 15, 2011) ("Plaintiff did not raise the issue of the consistency of the vocational expert's testimony with the DOT at the hearing or even in his appeal to the Appeals Council"); Pires v. Astrue, 553 F. Supp. 2d 15, 25 (D. Mass. 2008) ("Plaintiff's attorney did not object to [the vocational expert's] testimony")).

While it is not readily apparent on a first or second reading, Baker's actual argument is not that the VE gave descriptions of jobs that conflicted with the descriptions of those jobs in the DOT. Instead, she is arguing that she does

not have the RFC to perform the four jobs identified by the VE because her pain imposes a significant limitation on her reasoning ability.  Specifically, Baker argues that because the ALJ determined that she "requires simple instructions," Tr. 14, she does not have the RFC to do jobs that have a GED that requires level-two reasoning development.  As noted earlier, level-two reasoning development entails the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  DOT, Vol. II, App. C., at 1011.

In its broad outlines, Baker's argument has considerable appeal.  Dr. Kalfas did determine that Baker had moderate limitations in her ability to carry out detailed instructions, while determining that she was "able [to] understand, remember and carry out short and simple instruction."  Tr. 459.  In his initial hypothetical question the ALJ posited a need for "simple instructions," Tr. 37, and in his written decision, he determined that Baker "requires simple instructions," Tr. 11. Three of the four jobs the ALJ said Baker could do, marker (209.587-034), mail clerk (209.687-026), and compression-molding-machine tender (556.685-022), have GEDs that require level-two reasoning development, i.e., the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  DOT, Vol. II, App. C, at 1011. If the ALJ's decision had rested entirely on the availability of

jobs requiring level-two reasoning development Baker might well be entitled to a remand, presuming that "detailed but uninvolved" instructions, whatever they may be, are more complex than simple instructions.

But, the fourth job the ALJ said Baker could do, cleaner, housekeeping (323.687-022), has a GED that requires only level-one reasoning development. Because the ALJ ascribed to Baker an RFC that allows her to perform the cleaner job – her need for simple instructions comports with level-one reasoning development – the ALJ did not err at step five by determining that there are jobs in the national economy that Baker can perform. In her reply brief, Baker appears to concede, at least tacitly, that her RFC includes sufficient reasoning capacity to perform the cleaner job. But, she argues that her actual physical and mental RFC, as opposed to the RFC the ALJ erroneously determined, precludes her from performing that job. Because the court has rejected all of Baker's challenges to the ALJ's RFC determination, for the reasons explained above, the ALJ's determination that Baker is capable of working as a cleaner is supported by substantial evidence.

### Conclusion

There is no question that the ALJ's decision in this case has a few rough edges, such as his clerical error concerning

Baker's capacity for lifting, his failure to directly ask the VE whether his testimony was consistent with the DOT, and his determination that Baker only had the RFC to follow simple instructions but could perform three jobs requiring GED level-two reasoning development.  Even so, because the ALJ's determination that Baker has the RFC to perform the cleaner job is supported by substantial evidence, I recommend that: (1) Baker's motion for an order reversing the Commissioner's decision, document no. 9, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 10, be granted.

Any objection to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauth. Pract. of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
Landya McCafferty
United States Magistrate Judge

November 15, 2011

cc:  Karen B. Fitzmaurice, Esq.
     Francis M. Jackson, Esq.
     Gretchen Leah Witt, Esq.